UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| AILEEN A. JACKSON, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | Case No: 1:07-cv-112 |
| v. | ) | |
| | ) | |
| FLOWERS BAKERY OF CLEVELAND, | ) | Chief Judge Curtis L. Collier |
| L.L.C., FLOWERS FOODS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM**

Before the Court is Defendants' motion for summary judgment (Court File No. 32). Having reviewed the parties' briefs (Court File Nos. 38, 47, 48), the evidence, and the applicable law, the Court will **GRANT IN PART** and **DENY IN PART** the summary judgment motion (Court File No. 32).

## **I. RELEVANT FACTS**[1]

Flowers Bakery ("Flowers") is a baking company in Cleveland, Tennessee, that is an indirect subsidiary of Flowers Food, Inc. Plaintiff, who is African-American, worked there as an overnight packing employee from January 2005[2] until she was fired in December 2006. She alleges

---

[1] Defendants object to some of Plaintiff's evidence and request the Court strike the inadmissible evidence. When evaluating evidence, the Court give evidence the weight it deserves, and disregards inadmissible evidence. *See Brennan v. Tractor Supply Co.*, 237 F. App'x 9, 21 (6th Cir. 2007) (citing *State Mut. Life Assurance Co. v. Deer Creek Park*, 612 F.2d 259, 264 (6th Cir. 1979)).

[2] She previously worked for the company for several months as a temporary employee.

Defendants committed race discrimination and terminated her in retaliation for making complaints of racial harassment (Court File No. 14).

### A. Training and promotion

The packing area contains four lines, each handling a different product. Each line has two positions: feeders and catchers. Employees cross-trained on additional lines and positions earned more money.

Plaintiff worked on line 1 as a catcher and also did temporary work on line 4. She inquired about being trained for positions as a line 1 feeder and as a feeder and catcher on line 3. Her shift supervisor, Johnson Philipose, testified he was going to cross-train Plaintiff as a line 1 feeder, but at some point thereafter Plaintiff suffered a finger injury and was on light duty. Defendants contend when Plaintiff returned to work, she was needed on line 4 and employees were not being trained for line 3 because it was in operation infrequently, and temporary employees were used. Line 2 had been shut down. Plaintiff contends white employees with less seniority were given those training opportunities. Whether an employee was cross-trained for other lines was supposed to be based on seniority, ability, and desire. One employee testified white employees were often cross-trained but black employees were only assigned to temporarily fill other spots as necessary to keep production going. The company's affirmative action plan was supposed to ensure that qualified minorities were trained and promoted.

Plaintiff also inquired with Philipose about a promotion to the position of Mixer, but did not complete any forms because Johnson told her "he would take care of it."[3] Specifically, although

---

[3] Plaintiff contends Philipose admitted Move Request Forms are unnecessary for promotions, but the relevant testimony concerns cross-training, not promotions.

promotions require Move Request Forms, Plaintiff was unaware of the existence of such forms.

**B.     Hostile work environment**

Plaintiff complains of a hostile work environment. She heard a coworker refer to black employees as "those lazy n_____s." (That same coworker was heard by another employee referring to "G__ d___ n_____s." The other employee says she heard the N-word used by people joking around). Plaintiff heard another white employee tell Philipose, "You better get this n_____ off my a__," which prompted Philipose to tell the employee, "shhh." Plaintiff also heard another white coworker use the N-word when discussing interracial relationships and heard this employee refer to a black employee as an ape. Plaintiff also alleges Don Beavers, a shift supervisor, referred to a disabled black employee as a "a one-eyed 'N' word." Plaintiff never heard the word directed at her.

Packers were overseen by a "floor lady," who controls work schedules and rotations on each shift. Plaintiff contends her troubles increased when Deborah Humphries became her floor lady in August 2006. A witness testified she heard Humphries use the N-word at work. Plaintiff testified Humphries referred to black employees as "those people" on numerous occasions. Humphries generally referred to Plaintiff as "hey, you" or "you there," instead of calling her by her name.

Humphries also allegedly required Plaintiff to clean up after white employees while they took smoke breaks with Humphries. Other employees purposely made messes that Plaintiff was required to clean. Plaintiff was on light duty for about a month after an injury, and was the only employee required to clean on light duty. At one point, Plaintiff apparently refused to clean, and Humphries reported this insubordination to Philipose. Humphries also allegedly denied Plaintiff and

other black employees bathroom breaks[4] and would not talk to her black employees or make eye contact with them. She was also allegedly hostile to Plaintiff for chewing gum while working, but was not hostile towards white employees caught chewing gum on the line. Humphries also allegedly was slow to respond to calls for help when Plaintiff cut her finger and was bleeding over food.

Plaintiff complained to Philipose "numerous times" about the use of the N-word, and also complained to Joan Dalton, the director of human resources, and Kent Feagans, the company president. Dalton did not follow up. Feagans apparently did not believe her and found her claims unsubstantiated. She also complained to a human resources administrator. She also complained to Dalton about Humphries' treatment of her. Because she was not getting a positive response, in November 2006 Plaintiff contacted the NAACP and filed a charge of discrimination with the EEOC, and made Humphries and Philipose aware of the charge. She was fired within a month of informing management of her EEOC charge.

**C.     Discipline**

Plaintiff was first disciplined in September 2005, when Plaintiff was given a documented verbal warning for throwing a tub at Philipose and then not responding to his questions. Plaintiff insists she merely moved the tub in a non-threatening manner and did not hear Philipose ask about the tub. This discipline occurred after Plaintiff reported to Dalton that Philipose was having an affair with a subordinate employee and favoring that employee as a result. Philipose denies the affair. Philipose allegedly mentioned the complaint about the affair in the process of writing up

---

[4]One witness stated Humphries would also deny a white employee bathroom breaks, but witnesses named three additional black employees and a Native American employee who would be denied bathroom breaks, and another witness stated Humphries treated black and white employees different in terms of bathroom breaks.

4

Plaintiff. Shortly after the incident, Plaintiff alleges a white employee threw a barrel at another employee, but Plaintiff does not know if that employee was disciplined.

Plaintiff was disciplined in April 2006, after an argument with a white employee in which Plaintiff warned she "will take [her] head off," and if another employee stands in the way, she "will take his head off, too." Plaintiff admits making the statement, but contends she was unfairly written up because the white employee was not written up and employees have arguments on a daily basis. Philipose heard about the statement from Chris Yarber.

In early September 2006, Humphries reported to Philipose that Plaintiff refused to accept a cleaning assignment. Humphries said Plaintiff was loudly yelling that no one else was cleaning. Plaintiff accompanied Humphries to Philipose's office, where they talked to her but did not give formal discipline. Philipose wrote down his communication. He talked about Plaintiff's attitude and dislike for Humphries, and told Plaintiff he would not tolerate "any kind of attitude" anymore.

On September 19, 2006, Philipose recommended to Dalton and another manager that Plaintiff be terminated for disruptive conduct and intimidating co-workers after receiving a report from supervisor Don Beaver that Plaintiff said she is "ready to whip [Humphries] right now." Philipose and Beaver talked to the employee who heard the comment. Plaintiff denies making the comment.[5]

The next week, on September 26, 2006, Philipose sent an email to management reporting that Plaintiff is "getting out of control," and that she called people "whores" and "nasty b____es."

---

[5]Plaintiff contends the discipline for threatening Humphries was pretextual because Humphries testified she has been threatened by other employees and has not reported their threats. But Humphries did not report Plaintiff's alleged threat either. The alleged statement was made to a coworker and overheard by Beaver.

Feagans issued a final warning to Plaintiff, also on September 26, 2006, in which he recounted the "whip her right now" comment and stated there have been "similar threats to other employees." The final warning stated that co-workers continue to complain about Plaintiff's attitude and comments despite Feagans having "several conversations" with her.

Plaintiff initiated a peer review of her final write-up, in which a panel of employees conducts an investigation with the authority to overturn disciplinary action, and which resulted in the discipline being upheld. Feagans also conducted an investigation into Plaintiff's complaints and honestly believed Plaintiff was disruptive, did not like Humphries, and would ignore Humphries' direction. He met with Plaintiff on November 9, 2006, to discuss the results of his investigation. Feagans testified he wanted Plaintiff to succeed at work but "made her understand that the next issue, whether it was another veiled threat, verbal threat, use of poor language, that there was no other option than to terminate her."

### D.    Termination

On December 5, 2006, Plaintiff and a white employee named Vickie Guffey were working in adjacent positions on line 4, the same positions they had been working in for months. The floor lady (who was filling in for Humphries) approached Plaintiff and Guffey from across the production line, while the machines were still running, and asked the two to switch places. Because of the noise and distance, Plaintiff could not hear the floor lady. (Another employee testified she thought it was weird that the floor lady stood where she did because of the noise from the machines). Once they were able to hear, both Plaintiff and Guffey attempted to communicate to the floor lady they wanted

to talk to Philipose because they had safety concerns about the requested move.[6] Plaintiff maintains that she was respectful at all times. Philipose sent Plaintiff home, and Feagans then made the final decision to terminate Plaintiff, on December 7, 2006, for insubordination and poor performance. Guffey was not disciplined.

## II.    STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

First, the moving party must demonstrate no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court views the evidence, including all reasonable inferences, in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, the non-movant is not entitled to a trial based solely on its allegations, but must submit significant probative evidence to support its claims. *Celotex*, 477 U.S. at 324; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The moving party is entitled to summary judgment if the non-movant fails to make a sufficient showing on an essential element for which it bears the burden of proof. *Celotex*, 477 U.S. at 323. In short, if the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court may enter summary judgment. *Anderson*

---

[6]The safety concerns were apparently unique to this combination of employees, based on Plaintiff's height and hair style and the way Guffey moves. Philipose and Feagans contend there is no safety issue.

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

**III. DISCUSSION**

**A. Hostile Work Environment**

Defendants contend Plaintiff lacks a hostile work environment claim because the alleged conduct was not sufficiently severe or pervasive to alter Plaintiff's working conditions and management took appropriate corrective actions.

Title VII prohibits racial harassment that creates a hostile or abusive work environment. *Newman v. Federal Exp. Corp.*, 266 F.3d 401, 405 (6th Cir. 2001). To establish a prima facie case of a hostile work environment based on race, a plaintiff must show: (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment had the effect of unreasonably interfering with her work environment by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability. *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 600 (6th Cir. 2007). "A hostile work environment occurs '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The workplace environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citing *Harris*, 510 U.S. at 21-22).

In determining whether there was a hostile or abusive work environment, the Court must look to the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 787-88. Isolated incidents alone must be extremely serious to serve as a basis for liability. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000).

Plaintiff alleges a hostile work environment based on the numerous racial comments she and other coworkers heard,[7] the disparate discipline, cleaning assignments, training, and promotions, Humphries' alleged racism, and management's nonreaction to these problems. Plaintiff described in her affidavit how she felt unwelcome at work despite her excellent work, which caused her anxiety and sleep loss. Defendants contend any harassment was not sufficiently severe or pervasive to alter the conditions of her working environment. The Court disagrees. Plaintiff has alleged that her direct supervisor used a racist term at work, refused to address Plaintiff by her name, referred to black employees as "those people," refused to make eye contact with Plaintiff and other black employees, refused bathroom breaks to black employees, assigned Plaintiff extra cleaning jobs, refused to cross-train Plaintiff and other black employees, and generally treated Plaintiff more

---

[7]Defendants contend the Court should disregard Plaintiff's testimony on this issue as unbelievable. However, much of the testimony is corroborated by other witnesses, and where not corroborated, the testimony of those witnesses about the environment at Flowers nevertheless lends credence to Plaintiff's testimony. Defendants also argue that none of the racist comments was directed at Plaintiff, but "racial epithets need not be hurled at the plaintiff in order to contribute to a work environment that was hostile to her." *Jackson v. Quanex Corp.*, 191 F.3d 647, 661 (6th Cir. 1999); *accord Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 335 (6th Cir. 2008) (noting that "we may consider evidence of other acts of harassment of which a plaintiff becomes aware during the period [of] his or her employment, even if the other acts were directed at others and occurred outside of the plaintiff's presence").

harshly than white employees. Other employees are also alleged to have made racist comments at work. These acts are not "simple teasing, offhand comments, and isolated incidents." *Newman*, 266 F.3d at 405. The allegations portray a workplace permeated with racial hostility, where black employees including Plaintiff were subjected to racist treatment, sometimes in a humiliating fashion.[8] In addition, Plaintiff's allegations about the effects of the hostility on her satisfy the subjective prong of this analysis.

Defendants also contend there is no employer liability because Defendants have not been indifferent to Plaintiff's allegations. However, Defendants' reliance on *Blankenship v. Parke Care Ctrs.*, 123 F.3d 868, 873 (6th Cir. 1997), is misplaced because that case deals with coworker harassment. *See id.* ("When the harasser is a co-worker, the standard for determining employer liability is 'markedly different' from that applicable to supervisors."). Here, the person committing most of the alleged racism was Plaintiff's immediate supervisor, Humphries. *Johnson v. UPS*, 117 F. App'x 444, 452 (6th Cir. 2004) ("employer liability is established if the harassment was by a supervisor") (citing *Jackson*, 191 F.3d at 663).

Because a reasonable jury could conclude Plaintiff was subjected to a hostile work environment, Defendants' summary judgment motion will be **DENIED** on that claim.

B.  **Race Discrimination**

Defendants claim Plaintiff cannot establish a prima facie case of race discrimination regarding being denied cross-training opportunities, being assigned cleaning tasks, being denied a

---

[8]Defendants contend Plaintiff contributed to the atmosphere by calling employees "whores" and twice using the N-word herself. Plaintiff contends she called coworkers "whores" when they used the N-word. Because the overnight work atmosphere contained plenty of cursing and arguments, Plaintiff contends her behavior was part of the atmosphere but did not contribute to it.

promotion, being disciplined, and being terminated. Defendants also argue Plaintiff was disciplined and terminated for legitimate, non-discriminatory reasons and cannot prove pretext.

To establish discrimination, a plaintiff can present either direct evidence of discrimination or circumstantial evidence supporting an inference of discrimination. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). "The direct evidence and circumstantial paths are mutually exclusive; the plaintiff can meet her burden with either method of proof." *Weberg v. Franks*, 229 F.3d 514, 523 (6th Cir. 2000). Plaintiff contends she has direct evidence of discrimination, and in the alternative can prove her case through circumstantial evidence.

### 1. Direct evidence

Plaintiff contends she has direct evidence she was terminated based on her race. "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Tepper v. Potter*, 505 F.3d 508, 516 (6th Cir. 2007) (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003)). "Such evidence 'does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.'" *Id.* (quoting *Johnson*, 319 F.3d at 865).

As direct evidence that race was a motivating factor in Plaintiff's termination, she cites "Philipose's and Humphries' dispositions (as well as management's decision to turn a cold shoulder to complaints about discrimination) towards African Americans" (Court File No. 47, p. 30). The only evidence that Philipose is racist is a former employee's statement that Philipose treats white male employees differently than others, but the Court is unaware of any facts to support this opinion

or demonstrate that it is based on personal knowledge.[9] While there is evidence of racism by Humphries, she made only one disciplinary decision and was not even at work on the night Plaintiff was terminated.[10] Thus, a factfinder would need to draw inferences about how that single disciplinary decision contributed to or caused Plaintiff's termination, which occurred after a final warning had been issued and involved discipline by a supervisors not alleged to be racist. Because inferences would be required, the termination decision lacks direct evidence of racism. Essentially, the connection between the one disciplinary action and the eventual termination, which was based on disciplinary action not involving people accused of racism, is too thin to serve as direct evidence that Plaintiff was terminated due to discrimination. *See Leonard v. Towers*, 6 F. App'x 223, 231 (6th Cir. 2001) ("[T]he plaintiff must show some connection between the evidence of discriminatory animus and the adverse employment decision.").

2. **Indirect evidence**

Because Plaintiff is unable to prove discrimination with direct evidence, she must rely on indirect evidence, which the Court will analyze under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later modified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). Under the framework, the Plaintiff must first establish a prima facie case. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006).

---

[9]Plaintiff also alleges Philipose told an employee "shhhh" after the employee made a racist comment. That is not direct evidence of racism.

[10]Although Plaintiff does not reference Don Beavers in her argument, he is also accused of making a racist statement and was involved in a disputed disciplinary decision. But Philipose was also involved in that disciplinary decision, and in any event, there is no direct evidence of racism in other disciplinary decisions.

A prima facie case requires Plaintiff to show (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was treated differently than similarly-situated, non-protected employees. *Id.* at 707.

Plaintiff alleges a number of adverse employment actions, including her termination. *See Vincent v. Brewer Co.*, 514 F.3d 489, 495 (6th Cir. 2007) ("An employer's decision to discharge an employee is a classic example of an adverse employment action."). Defendants contend Plaintiff was not treated differently than any similarly-situated, non-protected employees. This comparison requires Plaintiff to compare her treatment with fellow employees whose employment situation is "nearly identical" in all relevant aspects. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). For the purposes of termination, Plaintiff identifies Guffey as a comparator. But there is no evidence Guffey had any prior disciplinary history, which is relevant to Plaintiff's termination in that Plaintiff received a final warning prior to her termination, so Guffey's employment situation is not "nearly identical" to Plaintiff's in a significant relevant respect.[11] Defendants introduced evidence that white employees who had been issued warnings or final warnings were subsequently terminated for misbehavior. Because Plaintiff cannot satisfy a prima facie case, her wrongful termination claim fails.

Plaintiff also alleges the cleaning tasks she was assigned were discriminatory. Defendants contend these tasks were not materially adverse employment actions, and the Court agrees. The United States Court of Appeals for the Sixth Circuit has defined a materially adverse employment

---

[11]Plaintiff also argues she has produced a prima facie case because her position remained open after she was fired. Her contention misapplies the law. The fact that a position remained open and an employer continued seeking applicants for that position is part of the prima facie case when a job applicant has been rejected from a job opening. *McDonnell Douglas*, 411 U.S. at 802.

action to mean:

> a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. Such a change must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Tepper v. Potter*, 505 F.3d 508, 515 (6th Cir. 2007) (quotation marks and citation omitted). Extra cleaning assignments are an alteration of job responsibilities, not a significant change.[12]

Plaintiff also alleges she was discriminated against in her training and promotional opportunities. Defendants contend Plaintiff was given cross-training opportunities, she was not treated differently than similarly-situated non-protected employees, and there were legitimate reasons for not cross-training Plaintiff in specific positions. Plaintiff devotes much of her limited response on this issue to showing that not receiving cross-training is an adverse employment action because cross-trained workers receive extra pay, despite this issue not being in contention. Plaintiff fails to raise a genuine issue of material fact. Assuming Plaintiff can prove a prima facie case, Defendant has articulated legitimate, nondiscriminatory reasons, and Plaintiff has not shown pretext. Plaintiff was not given the opportunity to train for lines 2 and 3 because line 2 was shut down and temporary employees were used on line 3 due to its infrequent operation. Defendants did not train Plaintiff as a line 1 feeder, but Plaintiff has no evidence to dispute Philipose's contention that he kept her on line 4 because that was where she was needed. Plaintiff did identify two white employees who were moved to the line 1 feeder position around the time she requested it, and she

---

[12]The cleaning assignments may be relevant to Plaintiff's hostile work environment claim.

believes those employees lacked experience and seniority relative to her, but Defendants claim those employees were moved to line 1 because they lost their positions on line 2 due to its shutdown. Those employees had to be cross-trained because their existing positions disappeared.

Defendants also contend Plaintiff never properly applied for promotional opportunities, which is a requirement for claims of failure to promote. *Nguyen v. City of Cleveland*, 229 F.3d 559, 562 (6th Cir. 2000). Although she once told Philipose that she wanted to apply for a Mixer position, she never completed a Move Request Form, which company policy required for promotions. Plaintiff was unaware of such forms, but they were required for promotions, as stated in the employee handbook she had received. Furthermore, Plaintiff's response does not advance any arguments about the lack of promotion.

Accordingly, Defendants' summary judgment motion will be **GRANTED** with respect to Plaintiff's race discrimination claims (except hostile work environment). Because Plaintiff no longer has a wrongful termination claim, Defendants' request to prevent reinstatement or front pay and decrease backpay due to after-acquired evidence is moot.

### C. Retaliation and Whisteblowing

Plaintiff contends she was disciplined and terminated for engaging in protected activity in violation of Title VII. She also alleges retaliation under the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304, which prohibits employees from being fired "solely for refusing to participate in, or for refusing to remain silent about, illegal activities."

A prima facie case of Title VII retaliation requires Plaintiff to show (1) she engaged in protected activity under Title VII; (2) Defendant knew she engaged in the protected activity; (3) Defendant subsequently took an adverse, retaliatory action against Plaintiff; and (4) the protected

15

activity and the adverse action were casually connected. *Smith v. City of Salem*, 378 F.3d 566, 570 (6th Cir. 2004). Protected activity includes retaliation against an employee who has participated in any manner in an investigation under Title VII or who has opposed any practice by an employer made unlawful under Title VII. 42 U.S.C. § 2000e-3(a).

Defendants contend Plaintiff's retaliation claim fails because there was no causal connection between any protected activity and Plaintiff's termination. Plaintiff describes her protected activity as reporting (1) Philipose's favoritism to his alleged paramour, (2) reporting the racial discrimination and hostile work environment to management, and (3) seeking assistance from the EEOC. She claims she was first disciplined within weeks of complaining about Philipose and was terminated within weeks of informing management about her EEOC contact.

Evidence "that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). However, temporal proximity alone is insufficient to show retaliation. *Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 550 (6th Cir. 2008) (citing *Nguyen*, 229 F.3d at 563). Temporal proximity must be considered with other evidence of retaliatory conduct. *Nguyen*, 229 F.3d at 563. Thus, Plaintiff must "proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Zanders v. National R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990).

Plaintiff claims she was fired within a few weeks of informing her employer of her EEOC complaint. But she offers no evidence other than temporal proximity to raise an inference that the EEOC charge (or internal complaints of discrimination) led to her termination. Furthermore, the final warning issued to Plaintiff occurred before Plaintiff's EEOC charge. Since the final warning

16

was the last step before termination, the timing of the EEOC charge relative to the termination does not suggest a causal connection.

Aside from the timing of the incidents, the only evidence of retaliation cited by Plaintiff is that, when Philipose was disciplining Plaintiff for the incident involving the tub, Philipose mentioned Plaintiff's complaint regarding his supposed affair with a subordinate. However, this action fails to satisfy the first prong of the prima facie case. Plaintiff's complaint about the affair was not protected activity under Title VII because Philipose's alleged favoritism towards an employee did not discriminate against other employees based on gender. *Tenge v. Phillips Modern Ag Co*, 446 F.3d 903, 909 (8th Cir. 2006) ("[A]bsent claims of coercion or widespread sexual favoritism, where an employee engages in consensual sexual conduct with a supervisor and an employment decision is based on this conduct, Title VII is not implicated because any benefits of the relationship are due to the sexual conduct, rather than the gender, of the employee."); *Womack v. Runyon*, 147 F.3d 1298, 1300 (11th Cir. 1998) ("Title VII does not encompass a claim based on favoritism shown to a supervisor's paramour."); *Taken v. Oklahoma Corp. Comm'n*, 125 F.3d 1366, 1369 (10th Cir. 1997); *Becerra v. Dalton*, 94 F.3d 145, 149-50 (4th Cir. 1996); *Ellert v. University of Tex.*, 52 F.3d 543, 546 (5th Cir. 1995) (holding that plaintiff's termination due to her knowledge of affair between supervisor and another employee was not within Title VII's ambit because employment decision did not rely on gender).

As for the Tennessee Public Protection Act, a prima facie case of retaliatory discharge requires Plaintiff to prove: (1) her status as an employee of the defendant; (2) her refusal to participate in, or remain silent about, illegal activity; (3) her discharge by the defendant; and (4) an "exclusive" causal relationship between her refusal to participate in the illegal activities and her

17

termination by the defendant. *Kinamore v. EPB Elec. Util.*, 92 F. App'x 197, 207 (6th Cir. 2004) (citing *Griggs v. Coca-Cola*, 909 F. Supp. 1059, 1063 (E.D. Tenn. 1995)).

Defendants contend Plaintiff's claim fails because she cannot satisfy elements two and four. Plaintiff's response lumps her state whistleblowing claim with her Title VII retaliation claim, and fails to offer any support for the whistleblowing claim. For the same reasons the Court concluded Plaintiff could not establish a causal connection between her activities and her termination, she is also unable to establish the "exclusive causal relationship" necessary under this statute. Plaintiff's only evidence of retaliation, resulting from Plaintiff's complaint about Philipose's affair, does not concern illegal activity.

Accordingly, Defendants' summary judgment motion will be **GRANTED** on Plaintiff's retaliation and whistleblowing claims.

### D. Corporate Parent

Defendants contend the corporate parent is not liable and should be dismissed. Defendants introduced evidence Flowers is an indirect subsidiary of Flowers Food, Inc., and personnel decisions are made by Flowers, not by Flowers Food, Inc. Plaintiff did not respond to this point, and from the evidence introduced, the Court concludes Flowers Food, Inc. is not Plaintiff's employer. *See Swallows v. Barnes & Noble Book Stores*, 128 F.3d 990, 992 (6th Cir. 1997). Accordingly, the Court will **GRANT** Defendants' summary judgment motion as to defendant Flowers Food, Inc., which will be **DISMISSED** from this case.

## IV. CONCLUSION

For the foregoing reasons, the Court will **GRANT IN PART** and **DENY IN PART** the

summary judgment motion (Court File No. 32) and **DISMISS** defendant Flower Foods, Inc.

An Order shall enter.

/s/
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**